# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-605


**STATE OF LOUISIANA**

**VERSUS**

**WILLIAM R. WEEKS, JR.**


**\*\*\*\*\*\*\*\*\*\***

ON APPEAL FROM THE
36TH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2018-719
HONORABLE MARTHA A. O'NEAL, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## JONATHAN W. PERRY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of D. Kent Savoie, Van H. Kyzar, and Jonathan W. Perry, Judges.


**AFFIRMED.**

Holli Herrle-Castillo
Attorney at Law
Louisiana Appellate Project
P.O. Box 2333
Marrero, Louisiana 70073
(504) 345-2801
**COUNSEL FOR DEFENDANT-APPELLANT**:
William R. Weeks, Jr.

William R. Weeks, Jr.
Pro Se Appellant
#7611102
MPWY/HIC-1
La. State Penitentiary
Angola, Louisiana 70712-9818


James R. Lestage
District Attorney
Parish of Beauregard
D. Wayne Bush
Assistant District Attorney
P.O. Box 99
Deridder, Louisiana 70634
(337) 463-5578
**COUNSEL FOR APPELLEE**:
State of Louisiana

**PERRY, Judge.**

On July 30, 2018, a Beauregard Parish grand jury indicted Defendant, William Ray Weeks, Jr.,[1] with four counts of first degree rape, a violation of La.R.S. 14:42; as well as two counts of molestation of a juvenile, a violation of La.R.S. 14:81.2(A)(1). The victim in two of the first degree rape charges and both molestation of a juvenile charges was Defendant's stepdaughter, S.M.[2] The victim in the remaining two first degree rape charges was D.J., Defendant's other stepdaughter. On May 14, 2021, the State filed an amended bill of indictment, charging Defendant with two counts of first degree rape of D.J., a child under the age of thirteen, born on February 4, 1998, and two counts of molestation of S.M., a child born on May 26, 1999.[3]

On May 20, 2021, after a jury trial of three days, the jury returned verdicts of guilty as charged on both first degree rape charges, not guilty as to one of the molestation charges, and guilty as charged on the other molestation charge. After defense counsel requested polling of the jury, it was discovered that a juror had not agreed with the verdict on either molestation charge. Accordingly, the trial court declared a mistrial as to the two counts of molestation and accepted the two guilty verdicts on the first degree rape charges. After defense counsel objected, contending the confusion of the jury should have resulted in mistrials on all counts, the trial court denied Defendant's request for mistrial on the first degree rape convictions.

On May 26, 2021, Defendant filed a "Motion for New Trial" contending the State failed to establish that the dates of the first degree rapes matched the dates

---

[1] Defendant was born on August 17, 1975.

[2] As required under La.R.S. 46:1844(W), we will refer to the victims by their initials.

[3] At the time of trial, S.M. was deceased.

alleged in the indictment and that Defendant was prejudiced by the trial court's denial of his motion to dismiss and/or sever the counts involving the victim S.M. following her death before trial. The same day, the State dismissed the molestation of a juvenile charges involving S.M. which had resulted in mistrials.

The trial court held a hearing on Defendant's "Motion for New Trial" on June 2, 2021. Following argument, the trial court denied Defendant's motion, finding the State provided sufficient evidence of the victim's age at the time of the crime and where they were living for the jury to determine the dates the offenses occurred. On June 7, 2021, the trial court sentenced Defendant to life imprisonment at hard labor on each count of first degree rape. The sentences were ordered to run concurrently.

Defendant now appeals his convictions and sentences, contending the State failed to provide sufficient evidence to uphold his convictions,[4] and the trial court

---

[4] On January 3, 2022, Defendant filed a motion to file a pro se supplemental appellate brief. This court granted Defendant's motion and ordered him to file his pro se supplemental brief on or before February 14, 2022. On February 7, 2022, this court granted Defendant "an extension until March 14, 2022, to file his pro se brief; however, no further extensions will be granted."

Later on February 14, 2022, this court issued the following order:

IT IS HEREBY ORDERED that Defendant-Appellant's "Motion for Production or Additional Records and Request for Extension of Time" is denied as Defendant-Appellant's counsel, on October 8, 2021, requested supplementation of the record with voir dire, opening statements, and closing arguments or with a certification that there were no defense challenges during voir dire that were denied and no objections lodged during opening statements or closing arguments and as on November 29, 2021, this Court received a supplemental record containing an affidavit from the court reporter indicating that there were no defense challenges during voir dire that were denied and no objections lodged by either side during opening statements or closing arguments.

IT IS HEREBY FURTHER ORDERED that no further extensions of Defendant's pro se briefing deadline will be granted.

This court received an additional pro se brief from Defendant on March 10, 2022. Defendant has supplemented appellate counsel's contention that the evidence is insufficient to uphold Defendant's conviction. We will incorporate Defendant's pro se argument with appellate counsel's.

We further note that on the cover page of Defendant's pro se brief, he has requested that

(continued . . .)

2

committed reversible error when it denied his pre-trial motion to dismiss or sever the charges involving S.M. from those involving D.J. following S.M.'s death before trial.

Because Defendant has raised an assignment of error involving the sufficiency of the evidence, we will first outline the witness testimony presented to the jury.

## TRIAL TESTIMONY

Detective Toree Simmons ("Detective Simmons") of the Beauregard Parish Sheriff's Office testified that she has been a full-time employee of the sheriff's office since 2015, acknowledging she left for about six to eight months in 2017. It was during her absence that the initial reporting of this criminal matter was made on December 20, 2017. Thus, she explained that Detective Tiffany Maks was the initial investigator in this case. After Detective Simmons returned to the Sheriff's Office, she was assigned the case on February 22, 2018.

Detective Simmons stated that as part of her employment at the Sheriff's Office she focused on sex offenses and crimes against children. She stated she has had extensive training on the investigation of sexual assaults and testified that delayed reporting was "more common than not" in sex offenses. She further acknowledged that when she was assigned the case, the initial interviews with the victims and some family members had already been completed. She also noted that she was aware of an ongoing investigation of Defendant in Vernon Parish on related charges. Detective Simmons stated she conducted five or six interviews, noting she

"these claims be set for Oral Motions before this Honorable Court, as the merits of these claims are deemed reviewable for relief." Defendant's request is moot for two reasons. First, the date set for oral argument to consider Defendant's appeal was February 22, 2022, and had already passed when Defendant's pro se brief was filed. Secondly, appellate counsel had already waived the right to oral argument.

3

spoke to both victims, their mother Tina "Marcy" Breen ("Mrs. Breen"), and Chase LeFleur ("Chase"), one of D.J.'s best friends and an ex-boyfriend of S.M.

Detective Simmons testified Defendant, Mrs. Breen, and the victims lived at a couple of addresses in Beauregard Parish over the years, both of which were located on Baggett Road. She believed the homes were owned by Mrs. Breen's family. After noting that S.M. was deceased at the time of trial, Detective Simmons testified that S.M. stated that Defendant had sexual contact with her in both Beauregard and Vernon Parishes. She disclosed that, due to the delayed disclosure of the offenses,[5] there was no forensic evidence, and neither girl was examined by a Sexual Assault Nurses Examiner (SANE) or a gynecologist. Detective Simmons testified that at the time of the investigation, D.J. was nineteen years old, married, and either pregnant or had one child; S.M. was eighteen and engaged with no children.

Detective Simmons testified that D.J. told her about an episode where her mother may have seen Defendant sexually assaulting her. On that occasion Defendant had entered D.J.'s room, got in bed with her, and vaginally penetrated her. Talking with S.M. and D.J. led Detective Simmons to understand that Defendant sexually assaulted both girls at numerous times and that no one else had touched them inappropriately.

Detective Simmons testified S.M. made the initial report of abuse and that D.J. was reluctant to speak with law enforcement. She also learned from her interviews with S.M. and D.J. that neither of them discussed the abuse with each other as children; rather, it was only after the two girls were adults that they spoke

_____

[5] D.J. would later testify that she reported the sexual abuse of Defendant in the later part of December 2017.

4

of their abuse with each other. According to Detective Simmons, S.M. came forward because she was concerned for an eleven-year-old cousin who was spending a lot of time with Mrs. Breen and Defendant.

On cross-examination, Detective Simmons stated she has investigated between two and three hundred cases of sexual abuse. When questioned further by defense counsel, Detective Simmons stated that she has never had a witness recant their disclosure or has she had to arrest a person for having falsely reported a case of sexual abuse.

Detective Simmons explained, too, that she executed a search warrant at 284 Paul Cooley Road after the victims' grandmother, Judy Moses, told her that S.M. had disclosed the use of a sex toy that was kept in a lockbox at the property. Detective Simmons stated a lockbox was found at the property shared by Defendant and Mrs. Breen at the time but noted no sex toy was recovered.

In response to defense counsel's questioning, Detective Simmons stated D.J. told her the first time Defendant abused her was when she was under the age of thirteen, and they were living in Beauregard Parish at one of the residences on Baggett Road. On that occasion, when her mom and S.M. were away, she was watching a Disney movie on the couch and Defendant anally penetrated her. She stated D.J. told her of two instances where Defendant penetrated D.J. vaginally but stated it occurred more often anally, including the first time Defendant abused her.

Again, on cross-examination Detective Simmons testified that D.J. told her about an instance where her mother had come into the room when she was first vaginally penetrated. According to Detective Simmons, D.J. stated that when her mother came into the room, she noticed that Defendant was in the bed with D.J., that D.J. was wearing no clothes, that D.J. was bleeding vaginally, and that her mother

5

placed her in the bathtub. She stated this incident was never reported. In addition, Detective Simmons stated that D.J. told her that Defendant penetrated her anally on multiple occasions, and that she had performed oral sex on Defendant, which she disclosed to her friend Chase in high school.

The State then called Mrs. Breen, the mother of the victims. Mrs. Breen testified that she married Defendant on August 13, 2003, after knowing him for three months. She stated at that time she, Defendant, S.M., and D.J. were all living at 166 Baggett Road. She testified they lived at 166 Baggett Road for two or three years before moving to the double-wide trailer at the end of Baggett Road for about a year or so before moving briefly to Rosepine[6] then returning to the double-wide. Mrs. Breen noted she was the primary caretaker for her daughters because Defendant "would not keep a job." She also stated Defendant would be the only one home most days when the girls returned from school. According to Mrs. Breen, the girls had separate bedrooms when they lived at 166 Baggett Road but slept in the same room because S.M., who was only four years old, did not want to sleep alone. She noted that in the double-wide, the girls shared a large room that had originally been two separate rooms before the wall between them was removed to make a single, larger room.

Mrs. Breen testified that when D.J. was about seven or eight, in approximately 2005 or 2006, she observed Defendant asleep in the bed with D.J. She testified that she found Defendant, who had been drunk and asleep on the couch when she went to bed, was in bed with D.J. in the middle of the night. When Mrs. Breen questioned Defendant, he told her he thought he was in their bedroom. Mrs. Breen further stated

_____

[6] In accordance with La.Code Evid. art. 201, we take judicial notice that Rosepine is in Vernon Parish, Louisiana.

6

that when she went to fix the covers after Defendant left the room, she noticed D.J., who normally did not sleep with a shirt, was also not wearing any panties. Mrs. Breen confirmed D.J. had underwear on when she had tucked her into bed. According to Mrs. Breen, Defendant was wearing pants and socks and his pants were buttoned when she found him in bed with D.J. She stated she then brought D.J. to the bathroom, checked and found no blood or fluids on her, and asked if D.J. was hurting anywhere, to which D.J. told her "No." Mrs. Breen stated she told Defendant he needed to get out of the house because it was inappropriate for him to be in a bed with her naked daughter.

Mrs. Breen testified Defendant then retrieved a gun, put it to his face, and stated he would kill himself if she thought he could hurt the girls. She never asked him why D.J. was naked. She testified that she spoke with the girls on multiple occasions about it not being okay for a grown-up to touch their private parts and stated the girls never told her anything about Defendant touching them. According to Mrs. Breen, D.J. left home at seventeen and went to live with her aunt, Toni Simmons; as Mrs. Breen testified, D.J. told her she left because she was tired of the way Defendant treated Mrs. Breen. She stated she did not hear about any type of molestation or abuse by Defendant until S.M. told her about Defendant's behavior on December 19, 2017.

Mrs. Breen testified she and Defendant were separated from February 2015 until approximately March 2017 and that her daughters lived with her during that time and never told her anything inappropriate had happened with Defendant. Mrs. Breen noted that although Defendant had mistreated her, he had never done anything to the girls in front of her. She testified that on the night she found Defendant in bed

7

with D.J., Defendant had been drinking alcohol to the point of passing out on the couch.

Mrs. Breen stated that when the girls finally disclosed what happened with Defendant, both she and S.M. called him to speak with them. She stated "what [S.M.] wanted him to do was admit things that he did and to leave our lives and walk away." Although they called Defendant, he never admitted to the molestation. She again testified that D.J. was seven or eight years old when she found Defendant in the bed with D.J., and S.M. would have been fifteen months younger.

On re-direct examination, Mrs. Breen noted that they were living in an old trailer when she found Defendant in bed with D.J. and that the trailer doors were noisy; accordingly, she testified that Defendant would have heard her walking around before she entered the room if he had been awake. She acknowledged that when S.M. was four or five years old, a friend of Defendant's father was visiting them. While S.M. was sitting on his lap, this individual touched S.M.'s crotch and moved her. When that happened S.M. told Mrs. Breen and Defendant's mother about that incident. Neither she nor Defendant's mother made any effort to confront the individual, instead they told S.M. not to go back outside around the adults. She testified that D.J. was born on February 4, 1998, and that S.M. was born on May 26, 1999.

The State then called D.J., who confirmed her birthdate was February 4, 1998. According to D.J., she was about eight years old when she, S.M., their mother, and Defendant lived at 166 Baggett Road. D.J. testified the family then moved down the road to 230 Baggett Road, where they lived in a double-wide trailer home. There, she and S.M. shared a "really big" bedroom; each had a twin-sized bed.

D.J. testified Defendant vaginally raped her at the 230 Baggett Road address. D.J. stated that she was asleep when Defendant, who was drunk, stumbled into the room. She testified that he got in her bed, took her underwear off, then vaginally entered her with his penis. She also testified it was not the first time Defendant had penetrated her. D.J. stated her "mom walked in and at that point my legs were on his shoulders and when she walked in and turned on the light -- at that point, he got off of me." She testified her mother took her to the bathroom, sat her on the toilet, and then her mother had a discussion with Defendant in their bedroom. D.J. stated that she was able to see her mother and stepfather talking in their bedroom from where she sat in the bathroom.

According to D.J., after she took a bath and put her night clothes back on, Defendant and her mother spoke to her in the living room, telling her not to say anything to her cousin Katie and claiming D.J.'s mother would also get in trouble if she told anyone what had happened. D.J. also testified that a few months before the incident when her mother caught Defendant in the act, Defendant had come home drunk, took off the leotard D.J. was wearing and vaginally raped her at one end of the couch while S.M. was sleeping at the other end. D.J. testified that during that incident, Defendant told her to be quiet so S.M. would not wake up.

According to D.J., Defendant had anally penetrated her prior to the two instances of vaginal rape, noting it began when they were living at 166 Baggett Road. She again confirmed she was in the second grade when it began. She noted Defendant anally raped her both in the living room and in her bedroom. D.J. testified the rapes occurred when S.M. was either playing in her bedroom or when she was asleep. Although D.J. could not remember how many times Defendant raped her, she noted that "it would be weekly." D.J. also testified that after the two instances

9

of vaginal rape at 230 Baggett Road, Defendant would make her use either her mouth or hand on his penis, again noting it was when her mother was at work and S.M. was in another room.

D.J. testified that eventually she told both her husband and S.M. about Defendant's abuse but that she did not report the abuse because she feared Defendant and was scared her mother would get into trouble. D.J. testified S.M. convinced her to report the abuse out of concern for their cousin Jolee, who was spending time with Defendant and Mrs. Breen. D.J. testified that even when S.M. went to the police, she still did not want to go to law enforcement, noting she had mental health issues stemming from the trauma of the rapes. D.J. testified she had been seeing a therapist for about two years and that she began seeing this therapist prior to S.M.'s death.

D.J. testified that the last time any sexual contact happened between her and Defendant was when she was thirteen and they were living in Rosepine. She testified she came home from school and Defendant anally raped her in his bedroom while S.M. was in the living room doing homework. D.J. stated she did not tell her mother because she did not think her mother would believe her. She further testified that her decision to leave was based on her mother's failure to leave, despite having been abused by Defendant on multiple occasions.

On cross-examination, D.J. testified she and S.M. never spoke to each other about being abused by Defendant, stating "[f]or me personally, I know I didn't want to hear about these things that were happening to her, and I feel that she felt the same way." D.J. again testified that her mother walked in while Defendant was in the act of raping her, contesting her mother's claim Defendant was asleep and she had to shake him awake. D.J. stated she was wearing a nightgown when her mom came

10

into the room and noted that she was bleeding enough that the blood got on her and her mother's nightshirt as she wrapped her legs around her mother's waist.

D.J. testified she left home the first time when she was seventeen, moving in with her aunt until her mother and Defendant split up, at which time she moved back in with her mother and S.M. D.J. stated she did not tell her mother about the abuse because she feared her mother would not believe her, stating she felt her mother was in denial about finding Defendant on top of her. She testified that growing up she had a great relationship with Defendant's family, stating she loved them and that "they were amazing." D.J. testified that her mother should have known what was happening the night she walked in when Defendant was raping her. D.J. confirmed that her fear of breaking up her extended family had come true, noting she has not seen her grandfather since she and S.M. reported Defendant's abuse.

The State then called Detective Rhonda Jordan ("Detective Jordan"), Chief Detective of the Vernon Parish Sheriff's Office.[7] Detective Jordan noted that she assigned herself Defendant's case in Vernon Parish, stating she investigated most of the sex offenses in the parish. According to Detective Jordan, she took statements from S.M. and D.J. separately, noting they told very similar stories that did not contradict each other. Detective Jordan stated that she listened to a number of jail calls from Defendant when he was incarcerated in Vernon Parish. She described a phone call Defendant made to his aunt, Joann Easterling ("Mrs. Easterling"), on April 4, 2018. Afterwards the State published the transcript of that call to the jury, which included a statement from Defendant that while he never touched the girls,

---

[7] The State filed a motion in limine regarding the admissibility of "other crimes evidence." The minutes of court from March 12, 2020, indicate the State and the defense stipulated that Detectives Jordan and Toree Jones would be allowed to testify about incidents of abuse in Beauregard and Vernon Parishes.

11

S.M., who was sixteen years of age at the time, would sleep in the bed with him and Mrs. Breen, and she (S.M.) would "[stick] her hand in my damn underwear and started playing with me . . . and it happened several times and what was I supposed to do[?]."[8] Detective Jordan noted Defendant had been in custody since February 28, 2018, so he had been incarcerated for a little over a month at the time of the phone call.

On cross-examination, Detective Jordan was asked to identify and read Mrs. Breen's[9] voluntary statement to the Vernon Parish Sheriff's Office. The statement of December 21, 2017, states, in pertinent part:

> I am stating that my daughter [S.M.] told me last night 12-20-17 that my husband molested and raped her from the time she was 4 or 5 until she was 16. I had no knowledge or suspicions of the crimes committed against her. My husband [sic] name is William Ray Weeks, Jr. (Billy Ray) DOB 8-17-75. . . . I confronted him on the phone yesterday evening and he denies that any of this happened. . . . Place of residence at the time of crimes was Stephens Mobile Home Park, Lot 6 1st St Rosepine LA 706[] There were also occurrances [sic] in Beauregard Parish. The BPSO has been notified and a complaint has been filed.

According to Detective Jordan, the only member of Defendant's family to ever contact her was his cousin, Jennifer, who asked questions about the process Defendant was going through. Following Detective Jordan's testimony, the State rested its case-in-chief.

Defendant's first witness was William Weeks, Sr. ("Mr. Weeks"), Defendant's father. Mr. Weeks identified photographs and diagrams of Defendant's home located in Vernon Parish. Mr. Weeks testified he and his wife would see the

---

[8] The jail call was introduced as an audio file. It was then played, and a transcript of the audio file was printed, provided to the jurors, and entered into evidence.

[9] At the time of the statement, Mrs. Breen was still married to Defendant and signed the document as Tina M. Weeks. For clarity and conciseness, we have simply referred to her as Mrs. Breen.

girls, Mrs. Breen, and Defendant nearly every weekend and holiday from the time Defendant married Mrs. Breen until 2017, when S.M. and D.J. made these allegations against Defendant. He testified the Weeks family loved the girls and that he does not know of anyone in the family who had ever heard any of these claims prior to December 2017.

Defendant then called Mr. Brian Lestage ("Mr. Lestage"), the Beauregard Parish Clerk of Court. Mr. Lestage confirmed via court records that Mrs. Breen filed a petition for divorce on May 11, 2015, and that Defendant answered the petition on May 28, 2015. He noted there was no judgment of divorce filed. Mr. Lestage noted Mrs. Breen filed a second petition for divorce on December 21, 2017, with an answer from Defendant on February 5, 2018, and ultimately a judgment of divorce was entered on September 27, 2018.

Next, Defendant called Mrs. Easterling, his aunt. Mrs. Easterling testified that she knew the girls very well and that she often spent weekends and holidays with them. Mrs. Easterling testified S.M. and D.J. never mentioned anything about Defendant abusing them, claiming S.M. "was a daddy's girl. She loved Billy Ray [Defendant] dearly, and he loved her dearly."

Following that testimony, Defendant called his cousin, Jennifer Stolzle ("Mrs. Stolzle"). According to Mrs. Stolzle, S.M. came to a Thanksgiving gathering in 2017 with her boyfriend. She claimed that S.M. "was extremely excited to see [Defendant] that day. They hugged, she kept kissing him on the cheek." She testified that neither girl had ever disclosed any sort of abuse by Defendant to her and stated that on Thanksgiving 2017, S.M. and Defendant left together to get alcohol for S.M. and her boyfriend. Mrs. Stotzle claimed that she had a good

relationship with the girls, they never said anything about being abused, and she did not believe the accusations they made against Defendant.

Mrs. Donna Duvall ("Mrs. Duvall"), the Mayor of Rosepine, another of Defendant's cousins was next called as a defense witness. She testified that she had known the victims since they were five or six and that she never saw or heard anything that she considered inappropriate between them and Defendant. According to Mrs. Duvall, Mrs. Breen never disclosed any issues she was having with Defendant or the girls. Mrs. Duvall confirmed she never lived with the girls, and she had no personal knowledge of any sexual conduct between Defendant and the girls.

That testimony was followed by the testimony of Mrs. Tammy Dickens ("Mrs. Dickens"), Defendant's maternal aunt. She testified the family got together on December 17, 2017, and that Defendant, Mrs. Breen, and S.M. were there, along with Mrs. Dickens's family, as well as Mr. Weeks, Sr., and his girlfriend. Mrs. Dickens testified there were twenty or twenty-five people present, and defense counsel introduced a photograph taken on December 17, 2017. Mrs. Dickens's husband would later identify the contents of the photograph.

Defendant then called Mr. Ray Dickens ("Mr. Dickens"), the husband of Mrs. Tammy Dickens. He stated the photograph introduced during the examination of his wife depicted Defendant, Mrs. Breen, S.M., and her boyfriend. He testified S.M. came outside where he, Defendant, and several other people were talking around a fire, sat in Defendant's lap with her arm around him, and conversed for about ten or fifteen minutes. Mr. Dickens testified his daughter Amanda was close to the girls in age, and they would often spend nights together. He testified neither girl ever reported anything to him and that nothing ever happened to his daughter.

14

Defendant concluded by calling Carol Hebert and Joey Woodard, who both testified they knew the girls. They testified that they never heard any complaints about Defendant from the girls, and the girls always seemed to love being around Defendant.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we have discovered no errors patent.[10]

## SUFFICIENCY OF THE EVIDENCE

In Defendant's first assignment of error,[11] he contends there was insufficient evidence to find him guilty of the two counts of first degree rape of D.J. Defendant contends the only evidence presented against him was the testimony of D.J., which he contends was contradicted by the testimony of his family and Mrs. Breen. The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations

---

[10] We note that Defendant was charged in counts one and two with first degree rape. At the time of the commission of the offenses, the name of the offense was aggravated rape. However, La.R.S. 14:42(E) states in pertinent part, "any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape."

[11] Defendant's pro se assignment of error adds nothing to Defendant's counseled assignment of error. Defendant's pro se argument is that D.J.'s testimony was insufficient to prove Defendant raped her; the premise for his argument is that the testimonies of D.J. and her mother presented a different version of events concerning the night her mother allegedly caught Defendant raping her. Thus, Defendant concludes in his pro se argument that D.J.'s testimony was impeached.

of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As noted by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138:

Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

In the present case, the State relied upon direct evidence from the victim, D.J.

Defendant contends in his brief:

[T]he State was required to prove that the appellant committed vaginal, anal, or oral sexual intercourse with D.J., that D.J. was under the age of thirteen, and that one act was committed between August 13, 2003[,] and August 12, 2004, for count one, and between August 13, 2004[,] and December 31, 2005, for count two.

We disagree with Defendant's assertion, noting:

At the outset, it should be noted that the date is not essential to the crime of aggravated rape; therefore, it need not be alleged in the indictment. When the date is not essential to an offense, the indictment shall not be held insufficient if it does not state a proper date. La.Code Crim.P. art. 468 (1960). The state is not restricted in its evidence to the date set out in the indictment.

*State v. Glover*, 304 So.2d 348, 350 (La.1974).

Furthermore, D.J. testified Defendant began raping her both anally and vaginally when she was eight years old and that it continued weekly while the family lived in Beauregard Parish, noting the last time Defendant abused her was when she

16

was thirteen. That testimony, if believed by the jury, clearly established Defendant raped D.J. at least twice when she was under the age of thirteen.

The crux of Defendant's argument is that D.J.'s testimony was uncorroborated by forensic evidence and was at odds with Mrs. Breen's testimony regarding the occasion in which she found Defendant in D.J.'s bed. However, as previously recognized in *F.B.A.*, 983 So.2d 1006, D.J.'s testimony alone is sufficient to sustain Defendant's convictions absent internal contradiction or irreconcilable conflicts with physical evidence. As Defendant points out, there is no physical evidence; therefore, there can be no irreconcilable conflict. Additionally, the record shows there are no internal contradictions in D.J.'s testimony.[12] As such, the case becomes one of witness credibility. As noted in *Kennerson*, it is not this court's role to second guess the credibility determinations made by the jury.

Defendant next contends D.J.'s testimony regarding what happened in Rosepine was unbelievable because "more likely than not a sexual assault would have been heard in the next room." We find this line of testimony related to the trailer in Rosepine is relevant in only one respect—to attack the credibility of the victim.

Although Defendant suggests this court should give weight to the "eight witnesses [who] testified that they saw the family frequently and the girls were comfortable with the appellant and never seemed to be in any type of distress," we observe that those witnesses were all Defendant's relatives, and all admitted they

---

[12] We note a slight variance between the testimony of D.J. and Mrs. Breen in one small detail. In her testimony, D.J. stated she was wearing a sleeping gown when Defendant raped her on one occasion. Mrs. Breen's testimony was that D.J. was naked in bed with Defendant. Though these witnesses' testimonies are slightly different, D.J.'s recollection and description never varied. Contrary to Defendant's contention in his pro se argument, although D.J. may have presented testimony that differed from her mother's, D.J.'s testimony was not impeached. Thus, this truly presented itself to the jury as a question of credibility.

had no knowledge of what happened behind closed doors in the Defendant's family home. It is clear to this court that the testimony of the eight defense witnesses, too, was relevant in only one respect—to attack the credibility of the victim.

In *State v. Breaux*, 08-1061, p. 13 (La.App. 3 Cir. 4/1/09), 6 So.3d 982, 991-92 (quoting *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936,) this court stated, "The question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness." In the light most favorable to the prosecution, the jury could have dismissed the testimony of Defendant's family and found D.J. to be more credible than her mother. Accordingly, we cannot say the State failed to meet its burden of proving Defendant raped D.J. on at least two occasions when she was under the age of thirteen. Accordingly, we find this assignment of error lacks merit.

**SEVERANCE**

In his second assignment of error, Defendant contends the trial court should have severed the charges of molestation of S.M., counts three and four of the indictment, prior to trial. As noted by Defendant, a trial court's ruling on a motion to sever "is addressed to the sound discretion of the trial court and the court's ruling should not be disturbed on appeal absent a showing of an abuse of discretion." *State v. Williams*, 418 So.2d 562, 564 (La.1982). Nevertheless, Defendant contends the molestation charges "could have been used by the jury to infer a criminal disposition" and contends the evidence presented regarding such abuses of S.M. were scant and indicative of the State's inability to prove the charges.

Initially, we observe Defendant's argument requires this court to take information unavailable to the trial court pre-trial at the time of the ruling, namely the evidence available to the State to prove the molestation charges and find the trial

18

court abused its discretion based upon such information the trial court could not have known. Additionally, we observe Defendant's argument that the charges "could have been used by the jury to infer a criminal disposition," lacks any merit considering La.Code Evid. art. 412.2(A), which states:

> When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

Defendant was accused of repeatedly raping his stepdaughter D.J. when she was as young as eight years old. Prior to D.J.'s delayed reporting of her abuse, her sister S.M. had independently provided delayed reporting to law enforcement and described similar behavior by Defendant, also when she was a young child. As previously noted, Detective Jordan separately took statements from S.M. and D.J. As Detective Jordan stated, S.M. and D.J. "told very similar stories that did not contradict each other." On this basis, we find that under La.Code Evid. art. 412.2(A), evidence of Defendant's alleged behavior against his other stepdaughter would have been admissible for the specific purpose of indicating "a lustful disposition toward children." For the foregoing reasons, we find the trial court did not abuse its discretion when it denied Defendant's motion to sever the counts involving S.M. Accordingly, we conclude this assignment of error lacks merit.

## DISPOSITION

For the foregoing reasons, Defendant's convictions and sentences are affirmed.

**AFFIRMED.**

19